UNITED STATES *v.* SEMON BACHE & Co. (No. 4110)[1]

---

[1] T. D. 49466.

388

United States Court of Customs and Patent Appeals, February 28, 1938

*Joseph R. Jackson*, Assistant Attorney General (*Samuel D. Spector*, special attorney, of counsel), for the United States.
*Jerome G. Clifford* for appellee.

[Oral argument December 6, 1937, by Mr. Spector and Mr. Clifford]

Before BLAND, Acting Presiding Judge, and HATFIELD, GARRETT, and LENROOT, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Second Division, in reappraisements 111688–A and 112228–A.

The imported merchandise consists of two qualities of gauge glasses, "Eureka" and "Hercules." It was purchased by appellee from Joseph Tomey & Sons, Ltd., Birmingham, England. That included in

reappraisement 112228–A was imported into the United States in April 1935, and that included in reappraisement 111688–A in October of that year.

The Eureka quality was entered by the importer—appellee—at various unit prices, less discounts of 10 per centum, 10 per centum, and 10 per centum, which, it is conceded by counsel for the parties, is the equivalent of the foreign manufacturer's list prices less 80 per centum discount, and the Hercules quality was entered at various unit prices, less discounts of 75 per centum, less 10 per centum, less 2½ per centum.

The merchandise was appraised at the foreign manufacturer's list prices, less 50 per centum discount, less 2½ per centum cash discount, less, as to the Eureka quality, 1 pence per dozen pieces for cost of fusing ends.

The importer appealed to reappraisement.

The trial court held that the entered values were the correct foreign values of the merchandise, and, on appeal, the appellate division of the Customs Court affirmed the judgment of the trial court.

It is agreed that the foreign values are the dutiable values of the merchandise. There is no dispute respecting the correctness of the manufacturer's unit list prices in the foreign market, and the sole issue before the courts below was as to the discounts which should be allowed from the manufacturer's list prices in order to make foreign values.

Before the trial court, appellee introduced in evidence Collective Exhibits 1 and 2—two affidavits of Joseph Leslie Tomey, managing director of the foreign manufacturer, and the testimony of the witness Isidore Sobel, vice president of Semon Bache & Co., appellee.

The Government offered in evidence Exhibits 3, 4, 5, and 6, consisting of reports of Government agents.

Collective Exhibit 1 relates to the Eureka quality gauge glasses, and Collective Exhibit 2 relates to the Hercules quality. Attached to and made a part of Collective Exhibit 1 is a copy of the record of sales made by the foreign manufacturer of the Eureka quality gauge glasses during the months of September, October, and November 1934, and a summary thereof. Attached to and made a part of Collective Exhibit 2 is a similar copy of sales and a summary thereof, relating to the Hercules quality.

It appears from Collective Exhibits 1 and 2 that merchandise like that here involved is sold in England for home consumption to four classes of purchasers designated in the exhibits as A, B, C, and D. Class A represents the *small users*, class B, retailers, class C, wholesalers, and class D, *"large users,* such as home railways, storage battery manufacturers, soda water syphon manufacturers, government departments, etc."* [Italics ours.]

Relative to the Eureka quality gauge glasses, the witness Tomey stated in his affidavit, Collective Exhibit 1, that the *usual wholesale quantity* was 1,000 feet; that the purchasers in class A purchased less than the *usual wholesale quantity*, and, therefore, were not allowed discounts granted to purchasers who purchased in the *usual* wholesale quantities of 1,000 feet or more; that the discounts allowed to purchasers who purchased less than 1,000 feet, depending on the quantity purchased, ranged from net list prices to list prices less discounts varying from 5 per centum to 75 per centum, less a further discount of 2½ per centum for cash; that the purchasers in class B were retailers who purchased in quantities ranging from 2 inches to 1,000 feet, at prices ranging from the net list price to the list price less discounts varying from 5 per centum to 75 per centum, less a further discount of 2½ per centum for cash. The witness stated that the sales to retailers "were sales at retail"; that they were not sales in the *usual* wholesale quantities of 1,000 feet or more; that *"Retail purchasers carry no stock and now buy in small quantities generally and place many repeat orders, as a result of which practice the number of sales has increased but not the value of the goods sold"*; that his company could not afford to allow to purchasers comprising classes A and B, or to other purchasers of less than 1,000 feet, the same discount granted to purchasers of quantities of 1,000 feet or more, because of the additional cost of handling the smaller quantities; that purchasers in class C (wholesalers) and class D (large users) who purchased 1,000 feet or more received the same discounts from the list prices as did appellee; that purchasers in classes C and D received an average discount of 82½ per centum from his company's list price; and that all purchasers purchasing in the usual wholesale quantities of 1,000 feet or more received the same discount. [Italics ours.]

Collective Exhibit 2 relates to the Hercules quality gauge glasses, and, with the exception that the witness stated the usual wholesale quantities of such gauge glasses to be 500 feet or more, the testimony is substantially the same as that contained in Collective Exhibit 1.

It will be observed that the only reason assigned by the witness for not giving sales to retailers who purchased the goods for the purpose of reselling at retail to consumers the status of wholesale sales is that retailers carried no stock and bought in small quantities, and that, due to the extra cost of handling such quantities, the manufacturer could not afford to allow them the same discounts allowed to purchasers of 1,000 feet or more of the Eureka quality and 500 feet or more of the Hercules quality.

The witness Sobel stated, in substance, that, through contact with the trade over a period of thirty-eight years, during which period he had purchased large quantities of gauge glasses from manufacturers thereof in England, he had become familiar with the market for such

merchandise; that wholesale quantities consisted of 1,000 feet or more of the Eureka quality, and 500 feet or more of the Hercules quality; that quantities less than 1,000 feet of the Eureka quality and 500 feet of the Hercules quality were not wholesale quantities; that all purchasers (*small users*, retailers, wholesalers, and *large users*, designated in Collective Exhibits 1 and 2 as A, B, C, and D), who purchased in quantities of 1,000 feet or more of the Eureka quality and 500 feet or more of the Hercules quality, received the same discounts received by appellee, regardless of the quantities purchased; and that *those who purchased in quantities of less than 1,000 feet of the Eureka quality and 500 feet of the Hercules quality, whether small users, retailers, wholesalers, or large users, received smaller discounts from the manufacturer's list prices, the amount of the discounts varying according to the quantities purchased.*

In its decision, the appellate division of the Customs Court stated that all sales of less than 1,000 feet of the Eureka quality gauge glasses, and less than 500 feet of the Hercules quality, were "not in *usual wholesale quantities,*" and, therefore, should not be included in determining the *usual* wholesale quantities. [Italics quoted.] The court further stated that it was thoroughly familiar with the pronouncements of this court in *United States* v. *Livingston & Southard, Inc.,* 23 C. C. P. A. (Customs) 214, T. D. 48060, and other cases, that the statutory "language 'in the usual wholesale quantities' was intended to refer to a *major portion* of the sales or offers for sale *in wholesale quantities, etc.,*" but that it did not believe that the rule stated in the decisions in those cases had any application to the issues in this case. [Italics quoted.]

In determining *usual* wholesale quantities, *all* wholesale quantities of the merchandise involved should, of course, be taken into account, and what the appellate division undoubtedly intended to say was that sales of less than 1,000 feet of the Eureka quality and less than 500 feet of the Hercules quality were *not* sales in *wholesale quantities,* and, therefore, should not be considered in determining the *usual* wholesale quantities.

In the case of *Jenkins Brothers* v. *United States,* 25 C. C. P. A. (Customs) 90, T. D. 49093, this court, in reviewing a judgment of the United States Customs Court, Third Division, involving the reappraisement of gauge glasses, imported from Scotland, some known as "Perth"—low-pressure gauge glasses, and others known as "Unific"— high-pressure gauge glasses, quoted a considerable portion, including the following, from the affidavit of the managing director of the foreign manufacturer of the merchandise there involved pertaining to the sale to retailers for resale:

In regard to the sales classed under the head *Retail* both of "Perth" and "Unific" qualities I Depone and say that these sales represent Gauge Glasses sold by my

Company to retail firms who are selling only to users. Such sales comprise a diversity of sizes and lengths // * * * of Gauge Glasses in comparatively small lots *and are not sales in the usual wholesale quantities and in the ordinary course of trade*, and as will be seen from the said summary the total number of such sales for the said period of three months in the case of "Perth" quality was 295 representing a total of 10,880 Glasses valued at £151:13:9d, the average number of Glasses per sale being 37 and the average value of each sale 10/3d, while the percentage of total value was 28%, and the total number of sales in the case of "Unific" quality was 333 representing a total of 16,385 Glasses valued at £295: 3:5d, the average number of Glasses per sale being 49 and the average value for each sale 17/9d, while the percentage of total value was 33%, and I Depone *and say that it was the practice of such retail customers to carry stocks of Gauge Glasses, but owing to the change in the nature of trade such customers now carry no stock and supply their requirements with smaller and more often repeated orders, the result of which has been to increase the number of such sales without increasing the quantity and value of the goods sold.* [Except the word *"Retail,"* italics not quoted.]

and affirmed the judgment of that court holding that sales made to retailers for resale *should be considered as wholesale sales* in the determination of the *usual wholesale quantities* of such glasses in the foreign market.

We quote from our decision in that case:

It is clear that, if it be proper to consider the sales by the exporter to retailers for resale in determining the usual wholesale quantity, then the judgment appealed from must be affirmed, for it is established that, if such sales were in wholesale quantities, the greater number of sales in wholesale quantities to all purchasers fell within the range of discounts applicable to sales of one dozen each.

*It is true that the affidavit of said Moncrieff states that sales to retailers for resale are not in the usual wholesale quantities, but this is merely a conclusion by him, drawn from the facts set out in detail in his affidavit.* While a statement that a given quantity is or is not a usual wholesale quantity might in some circumstances be regarded as some substantial evidence of the fact, *such a statement can have no weight as a statement of fact when all of the facts upon which the statement is made are disclosed. It then becomes merely a conclusion of the witness, which can have no weight with the court in determining what is a usual wholesale quantity.*

The question therefore is, may sales to retailers of one dozen or more gauge glasses at a time, for resale, be considered in determining what are usual wholesale quantities in the sale of merchandise such as is here involved. Appellant has cited no authority to the effect that it is improper to take into consideration sales to retailers, for resale, in determining what are usual wholesale quantities. Of course, such sales are not the sole determining factor, *but it is clear that they should be considered, together with other sales in wholesale quantities, in determining what are usual wholesale quantities.* See *Goldmark & Sons Corp.* v. *United States,* 22 C. C. P. A. (Customs) 358, T. D. 47378. [Italics not quoted.]

Funk & Wagnalls Standard Dictionary defines "wholesale" as follows:

The sale of goods by the piece, bulk, or quantity, opposed to *retail:* * * *.

"Retail" is defined by the same authority as follows:

The selling of goods in small quantities, especially by those who have bought in large quantities to resell at a profit.

The Century Dictionary defines "wholesale" as follows:

Sale of goods by the piece or in large quantity—disting. from *retail.*

*         *         *         *         *         *         *

Were we to adopt appellant's theory and hold that sales by a manufacturer ōr wholesaler to a retailer, who purchases for resale, may not be considered in determining the usual wholesale quantities of merchandise, it would in many cases be impossible to arrive at the foreign value of merchandise, when, under another construction which we hold is proper, all of the statutory elements may be present to enz⸱le the finding of such value.

It will be observed that the evidence in the instant case relative to the sales to retailers, that is, that retail purchasers do not carry gauge glasses in stock, but buy in small quantities "generally," and "place many repeat orders, as a result of which practice the number of sales has increased but not the value of the goods sold," is not substantially different from that introduced in the *Jenkins* case, *supra*.

In the *Jenkins* case, *supra*, the Third Division of the United States Customs Court held that the sales to retailers, for resale, *were wholesale sales*, and took such sales into account in its determination of the usual wholesale quantities in the ordinary course of trade.

In the instant case, the Second Division of the United States Customs Court held that sales to retailers, for resale, were *not* sales in wholesale quantities, and did *not* take such sales into account in its determination of the usual wholesale quantities in the ordinary course of trade.

In the *Jenkins* case, *supra*, this court, as hereinbefore noted, affirmed the judgment of the Third Division of the Customs Court, and held that sales of gauge glasses to retailers, for resale, were sales in wholesale quantities and should be considered in determining the usual wholesale quantities in which the gauge glasses there involved were sold in the ordinary course of trade. In so holding, this court considered the evidence of record, the common meaning of the terms "wholesale" and "retail," and the statutory provisions defining foreign value, contained in section 402 (c) of the Tariff Act of 1930, hereinafter quoted.

In the instant case, we are called upon to determine whether, as a matter of law, the holding by the Second Division of the Customs Court that the sales of gauge glasses in England by the manufacturers thereof to retailers, for resale, were not sales in wholesale quantities in the ordinary course of trade, is supported by any substantial evidence of record. If it is, the judgment should be affirmed. If it is not, the judgment should be reversed.

Section 402 (c) of the Tariff Act of 1930 provides that—

* *· * The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

Considering the provisions of section 402 (c), *supra*, and the dictionary definitions of the terms "wholesale" and "retail," we think it may be said that, as a general proposition, where goods are sold in the ordinary course of trade to retailers, for resale, the other essentials in the statutory definition of foreign value being present, such sales are sales in wholesale quantities, and should be considered together with other sales in wholesale quantities in "determining what are usual wholesale quantities." *Jenkins Brothers* v. *United States, supra.*

It clearly appears from the record, and there is no evidence to the contrary, that retailers and wholesalers, as well as all other purchasers, purchasing quantities of less than 1,000 feet of the Eureka quality gauge glasses and less than 500 feet of the Hercules quality, pay the manufacturer's list prices, less varying discounts, depending upon the quantities purchased, and that both qualities of gauge glasses are freely offered for sale in England to such purchasers; in such quantities, and at such prices.

In view of those facts, can it be said that those offers for sale, and sales made in accordance therewith, were not in the ordinary course of trade?

There is no evidence of record to establish that the sales to retailers, for resale, referred to in the testimony of the witnesses for appellee, were not made in the ordinary course of trade. Nor is there any evidence of record to establish that such sales, and sales to other purchasers in quantities less than 1,000 feet of the Eureka quality and 500 feet of the Hercules quality, were not in wholesale quantities, except mere assertions by the witnesses Sobel and Tomey to that effect. Inasmuch as those assertions were mere conclusions based upon facts appearing of record, they should have been given no weight by the courts below in determining the usual wholesale quantities of the merchandise in question in the ordinary course of trade in England. *Jenkins Brothers* v. *United States, supra.*

Although the witness Sobel testified that the usual wholesale quantities were 1,000 feet or more of the Eureka quality and 500 feet or more of the Hercules quality, and that sales in less than those quantities were not wholesale sales, he also testified, in substance, that both qualities were freely offered for sale and sold to retailers, and to all other purchasers, in less quantities, in the ordinary course of trade, at varying prices, depending upon the quantities purchased.

Obviously, in testifying as to the wholesale quantities and the usual wholesale quantities of such gauge glasses, the witness disregarded sales to retailers in quantities less than 1,000 feet of the Eureka quality and 500 feet of the Hercules, evidently being of opinion that sales to retailers in the ordinary course of trade in quantities less than 1,000 feet of the Eureka quality and 500 feet of the Hercules should

not be considered sales in wholesale quantities. It is clear, therefore, that the witness had an erroneous conception of what, in the contemplation of the law, constitutes *wholesale quantities* and *usual wholesale quantities* in the ordinary course of trade, and his conclusions in that regard are entitled to no weight.

There may be instances where sales by manufacturers to retailers, for resale, *are not "in the ordinary course of trade,"* within the purview of section 402 (c), *supra.* [Italics ours.] See *United States* v. *A. W. Faber, Inc.,* 21 C. C. P. A. (Customs) 290, 293, T. D. 46819 [46817]. However, we are not here confronted with such a situation.

Counsel for the Government contend that the usual wholesale quantities in the ordinary course of trade for each quality of the involved gauge glasses are 12 dozen feet, and that the appraised values are the correct dutiable values, and we are asked to hold that the appraised values are the dutiable values.

It is not within the province of this court to make findings of fact in reappraisement cases. The jurisdiction of the court, in such cases, is limited to the review of judgments of the appellate division of the United States Customs Court on questions of law only.

We are of opinion that there is no substantial evidence of record to support the findings of the appellate division of the Customs Court.

The judgment is *reversed,* and the cause *remanded* for a reconsideration of the issues on the record as made and in accordance with the views herein expressed.